Nadja Yang
200 E Liberty St Lbby Unit 7760
Ann Arbor, MI 48107
M: Nadja Yang <nadja@njy.dev>
C: tel:332.203.3124
Debtor and Appellant *pro se*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

San Francisco Division

| | |
|---|---|
| In re:<br>NADJA YANG,<br>*Debtor.* | No. 3:26-cv-07259-WHO<br>Hon. William H. Orrick<br>United States District Judge |
| NADJA YANG,<br>*Appellant,*<br>v.<br>REGENTS OF THE UNIVERSITY OF MICHIGAN, *et al.*,<br>*Appellees.* | **APPELLANT'S REPLY BRIEF**<br>On Appeal from the United States Bankruptcy Court for the Northern District of California<br>Bankr. No. 26-30507 WJL<br>Hon. William J. Lafferty III<br>United States Bankruptcy Judge |

## Introduction

The Congress has power "[t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. Congress has exercised that power. "[T]he district courts shall have original and exclusive jurisdiction of all cases under title 11," 28 U.S.C. § 1334(a), and a case under title 11 "may be commenced in the district court for the district . . . in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located" for the statutory period. 28 U.S.C. § 1408(1). Where a case under title 11 may be commenced is therefore a question of federal statutory law. *Cf. Citizens & S. Nat'l Bank v. Bougas*, 434 U.S. 35, 41 (1977) ("Unquestionably Congress had authority to prescribe the manner and circumstances under which [national] banks could sue or be sued in the courts" (quoting *Mercantile Nat'l Bank v. Langdeau*, 371 U.S. 555, 559 (1963))). "If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent," which "allows both of our branches to adhere to our respected, and respective, constitutional roles." *Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004).

The Regents of the University of Michigan "did not seek or participate in the dismissal of this bankruptcy case." Regents' Br. 3. They appear "specially" [sic],[1] reserving "all rights, defenses, and immunities," and they "take[] no position here on any claim the Debtor asserts against" them. Regents' Br. 7. They ask this Court to affirm two orders of the Honorable William J. Lafferty III, United States Bankruptcy Judge:

[1]The response brief is captioned "Specially Appearing Appellee's Response Brief." The Federal Rules of Civil Procedure left the special appearance no office: "No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion." Fed. R. Civ. P. 12(b). On the docket of this Court the Regents of the University of Michigan are the appellee, ECF No. 10, and they have filed an appellee's brief. The brief lists as counsel "Robert C. Folland (pro hac vice)" and "Amy C. Poyer, SBN 277315," and is signed by Amy C. Poyer. Regents' Br. cover page, 19. An attorney who is not a member of the bar of this Court "may apply to appear pro hac vice in a particular action in this district" and "must submit the application and admission fee at the time of . . . the attorney's first appearance in the case." Civil L.R. 11-3(a)–(b) (N.D. Cal.). The docket of this appeal, ECF Nos. 1–10, records no application.

the Order Dismissing Case for Improper Venue, "without adopting the proposition that individuals may file only where they reside," *id.* at 3–4, which is the proposition on which that order rests, Bankr. Dkt. 24, at 1; and the Order Denying Motion to Alter or Amend, "without endorsing the July 13 order's jurisdictional premise," Regents' Br. 15, which is the ground that order states: "This Court is persuaded that it should deny the Motion for lack of jurisdiction." Bankr. Dkt. 42, at 2.

"Assuming the lack of notice and a hearing was error," the Regents of the University of Michigan write, "the question is whether it affected the disposition." Regents' Br. 3. They "accept[] the Debtor's factual proffer for purposes of this argument," *id.* at 9, and submit that "the asserted connections are legally insufficient to establish venue in this district." *Id.* at 11. Whether the accepted facts establish venue is a question of law, which the Regents of the University of Michigan and the Debtor both ask this Court to decide. *Id.* at 3, 12–13. The accepted facts establish venue: the Debtor's deposits qualify as principal assets, a deposit is a debt owed by the bank, a debt is located where its obligor is found, and SoFi Bank is found in San Francisco (Part 1). Because the accepted facts establish venue, the error was not harmless (Part 2). The remedy is for this Court to hold that venue lies in this district, to reverse both orders, and to direct the further proceedings the opening brief requested (Part 3). The costs of the appeal should be taxed against the Regents of the University of Michigan, the appellee. Fed. R. Bankr. P. 8021(a)(3).

## Argument

### 1 Venue Lies in This District

The Order Dismissing Case for Improper Venue rests on a rule of venue that Congress did not enact, Opening Br. 13–15, and the Regents of the University of Michigan do not defend the rule: they ask the Court to affirm "without adopting the proposition that individuals may file only where they reside," Regents' Br. 3–4, and they

do “not rely on Michigan residence to foreclose the principal-assets ground.” *Id.* at 7–8. The order’s alternative ground was that “the bank where she claims to have her assets is not located in San Francisco, but in Utah.” Bankr. Dkt. 24, at 2 & n.1. The Regents of the University of Michigan do not say that the deposits were located in Utah. They “assume[] for this appeal that the Debtor’s deposits were her principal assets, although the truth of this claim is far from certain,” Regents’ Br. 6; they “accept[] the Debtor’s factual proffer for purposes of this argument,” *id.* at 9; and they disclaim “a categorical rule that a national bank’s charter address determines every deposit’s situs.” *Id.* at 10.

The facts, as the Regents of the University of Michigan accept them, are that SoFi Technologies, Inc. “directs, controls, and coordinates all banking operations from San Francisco”; that the Debtor opened the account “through the SoFi platform”; that “SoFi has no customer-facing facility in Ann Arbor or Utah”; and that the terms of use under which the account was opened “cover[] SoFi Bank and the services through which she opened her account, select California law, and provide for disputes in San Francisco County.” Regents’ Br. 5, 9–10; *see* Bankr. Dkt. 28, at 4–6. What remains is a question of law, where a deposit is located, and the opening brief answered the question: “A deposit is a debt, and a debt is located where the obligor is found.” Opening Br. 8; *see id.* at 16–20. The Regents of the University of Michigan agree that “[a] deposit is a claim against the bank for the account balance,” Regents’ Br. 8, and on the facts that the Regents of the University of Michigan accept, the obligor is found in San Francisco.

### 1.1 A Deposit Is a Debt Owed by the Bank

“In the modern economy, most money takes the form of bank deposits.” Michael McLeay, Amar Radia & Ryland Thomas, *Money Creation in the Modern Economy*, Bank of Eng. Q. Bull. 2014 Q1, at 14, https://www.bankofengland.co.uk/-/media/boe/files/quarterly-bulletin/2014/money-creation-in-the-modern-economy.pdf. Deposits are “essentially IOUs from commercial banks to households and companies,” *id.* at 15, and “[b]ank deposits are simply a record of how much the bank itself owes its customers.”

*Id.* at 16.[2] In the United States, by the Federal Reserve's figures, most money likewise takes the form of bank deposits. For September 2026, seasonally adjusted, the currency component of M2 was $2,397.2 billion; demand deposits, other liquid deposits, and small-denomination time deposits together were $19,170.0 billion; and M2 was $23,413.9 billion. Bd. of Governors of the Fed. Reserve Sys., *Money Stock Measures*, H.6 Statistical Release (Oct. 27, 2026), tbls. 1–2, https://www.federalreserve.gov/releases/h6/20261027/default.htm. About one dollar in ten is a note or a coin, and about eight in ten are deposits, which are records of debts. If a deposit is located nowhere, eight dollars in ten are located nowhere.

### 1.2 A Debt Is Located Where the Obligor Is Found

Congress enacted the words "principal assets . . . located" in 1978, Pub. L. No. 95–598, § 241(a), 92 Stat. 2549, 2669 (former 28 U.S.C. § 1472(1)), https://www.govinfo.gov/content/pkg/STATUTE-92/pdf/STATUTE-92-Pg2549.pdf, in the same enactment that gave the bankruptcy court "exclusive jurisdiction of all of the property, wherever located, of the debtor," *id.* § 241(a), 92 Stat. at 2669 (former 28 U.S.C. § 1471(e)), and re-enacted the words in 1984. 28 U.S.C. § 1408(1).

The opening brief quoted the rule from *Sturm* and *Harris*: "whatever of substance there is must be with the debtor," and "[t]he obligation of the debtor to pay his debt clings to and accompanies him wherever he goes." Opening Br. 17 (quoting *Chicago, Rock Island & Pac. Ry. Co. v. Sturm*, 174 U.S. 710, 716 (1899), and *Harris v. Balk*, 198 U.S. 215, 222 (1905)). The rule is older than both decisions. "Our attachment laws had their origin in the custom of London. . . . Under it a debt was regarded as being where the debtor was, and questions of jurisdiction were settled on that regard." *Sturm*, 174 U.S. at 714–15. Lord Holt denied prohibition "because the debt always follows the person of the debtor, and it is not material where it was contracted." *Id.* at 715 (quoting

[2] The Regents of the University of Michigan note that the Debtor "applied for the account from Ann Arbor." Regents' Br. 9. Where the depositor sat does not locate the debt. A deposit comes into existence when the bank credits the account, McLeay et al., *supra*, at 16, and when funds arrive from another bank they arrive "along with reserves, which the buyer's bank uses to settle the transaction." *Id.* at 19 fig. 2.

*Andrews v. Clerke*, 1 Carth. 25). Of the place of payment the Supreme Court said: "The proposition that the *situs* of a debt is where it is to be paid, is indefinite. 'All debts are payable everywhere, unless there be some special limitation or provision in respect to the payment . . . .'" 174 U.S. at 716–17 (quoting 2 Parsons on Contracts 702 (8th ed.)).[3] The rule was the same for the administration of estates: "The general rule of law is well settled, that for the purpose of founding administration all simple contract debts are assets at the domicil of the debtor." 174 U.S. at 714 (quoting *Wyman v. Halstead*, 109 U.S. 654, 656 (1883)). "Debts cannot be assets at the domicil of the debtor if their locality is fixed at the domicil of the creditor." *Id.* A debt may be garnished, *Harris* added, in any State in which the obligor is found, "provided the garnishee could himself be sued by his creditor in that State." *Harris*, 198 U.S. at 222. Justice Brandeis applied the rule to bank deposits: "Indebtedness due from a resident to a non-resident—of which bank deposits are an example—is property within the State." *Pennington v. Fourth Nat'l Bank*, 243 U.S. 269, 271 (1917).

One year before the 1978 Act, the Supreme Court restated the rule: "This Court reasoned that the debt Harris owed Balk was an intangible form of property belonging to Balk, and that the location of that property traveled with the debtor." *Shaffer v. Heitner*, 433 U.S. 186, 200 (1977). The Court quoted Justice Brandeis's statement that "[i]ndebtedness due from a resident to a non-resident—of which bank deposits are an example—is property within the State." *Id.* at 211 n.38 (quoting *Pennington*, 243 U.S. at 271). The question decided in *Shaffer* was whether the Fourteenth Amendment permits a State's courts to take jurisdiction over a nonresident on the strength of "the presence of the property alone." *Id.* at 189, 209. The Court held that "all assertions of state-court

[3] The "account-specific inquiry" that the Regents of the University of Michigan propose, illustrated by facts that "are not mandatory elements," looks to "where the account was opened" and to "the place where her deposit is maintained or repayable." Regents' Br. 6, 8–9. On the facts the Regents of the University of Michigan accept, the account was opened in San Francisco: the Debtor's application went to SoFi entities, "among them SoFi Bank, National Association," that are "directed and controlled from San Francisco" and have "no physical branch at which the account could have been 'opened'" in Ann Arbor or in Utah. Bankr. Dkt. 28, at 4–5.

jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny," and that "[t]o the extent that prior decisions are inconsistent with this standard, they are overruled." *Id.* at 212 & n.39. The presence of the property in the State was the premise of the question decided: the Delaware courts had "based their assertion of jurisdiction in this case solely on the statutory presence of appellants' property in Delaware." *Id.* at 213. Justice Stevens, concurring in the judgment, wrote that "[i]f I visit another State, or acquire real estate or open a bank account in it, I knowingly assume some risk that the State will exercise its power over my property or my person while there." *Id.* at 218. The Ninth Circuit has since cited *Harris* for the proposition that "*quasi in rem* jurisdiction can be asserted over intangible property." *Office Depot, Inc. v. Zuccarini*, 596 F.3d 696, 700 (9th Cir. 2010).

Section 1408 prescribes the districts in which a case under title 11 "may be commenced," and the Supreme Court reads "located" in a venue prescription to permit more than one place: a venue prescription "simply delineates where within a given judicial system a case may be maintained," and "[i]n the context of venue, 'located' may refer to multiple places." *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 318 (2006); *see* Opening Br. 17. "There is no enduring rigidity about the word 'located,'" and for venue a national bank is located wherever it keeps a branch, a reading the Court adopted after noting that Congress's concern with "compelled production of bank records for distant litigation" "is also diminished by improvements in data processing and transportation." *Bougas*, 434 U.S. at 44–45. Section 1408(1) accordingly asks whether the assets were located in this district, not whether they were located here alone.[4]

### 1.3 SoFi Bank Is Found in San Francisco

Section 1408(1) names the "principal place of business" beside the "principal assets," and the phrase "principal place of business" in the diversity statute was "borrowed from

[4]The Regents of the University of Michigan observe that "[t]he three California offices the Debtor identifies are in Sacramento, Live Oak, and Yuba City, outside this district." Regents' Br. 10. That SoFi Bank may also be located in other districts does not show that SoFi Bank is not located in this district.

bankruptcy." Opening Br. 24. "Principal place of business" in 28 U.S.C. § 1332(c)(1) is "the place where a corporation's officers direct, control, and coordinate the corporation's activities," which "in practice . . . should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination." *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010). The proffer that the Regents of the University of Michigan accept is that the parent "directs, controls, and coordinates all banking operations from San Francisco." Bankr. Dkt. 28, at 6. Judge Lafferty placed the bank "in Utah" by the address of its "corporate headquarters." Bankr. Dkt. 24, at 2 & n.1. That address "is designated as the main office." Bankr. Dkt. 28, at 6; *see* Regents' Br. 5. A national bank's main office determines the State of which the bank is a citizen "for § 1348 purposes," that is, for diversity jurisdiction, *Wachovia*, 546 U.S. at 307, and the Supreme Court observed in the same opinion that "in almost every case, as in this one, the location of a national bank's main office and of its principal place of business coincide." *Id.* at 317 n.9. A headquarters counts under *Hertz* when it is "the actual center of direction, control, and coordination," 559 U.S. at 93, and on the accepted facts that center is in San Francisco. The Regents of the University of Michigan answer that they "rel[y] on the distinction between the bank and its parent." Regents' Br. 10. Banking operations are the operations of the bank, and the accepted fact is that "all banking operations" are directed, controlled, and coordinated "from San Francisco." Bankr. Dkt. 28, at 6.

SoFi Bank's reserve balances are held at the Federal Reserve Bank of San Francisco. The Regents of the University of Michigan write that "the Federal Reserve's Twelfth District identif[ies] regulators, not the place where her deposit obligation is performed." Regents' Br. 10.[5] A deposit obligation is performed by payment. Banks pay

[5] A Federal Reserve Bank is "a body corporate" empowered "[t]o make contracts," "[t]o sue and be sued," and to exercise "such incidental powers as shall be necessary to carry on the business of banking." Federal Reserve Act, ch. 6, § 4, 38 Stat. 251, 254–55 (1913) (codified as amended at 12 U.S.C. § 341). A national bank is required to hold stock in the Federal Reserve Bank of the bank's district: "Every national bank in any State shall . . . become a member bank of the Federal Reserve System by subscribing and paying for stock in the Federal Reserve bank of its district," *id.* § 2, as amended by Pub. L. No. 85–508, §

in central bank money, which banks hold "to meet withdrawals by the public" and to "make payments to other banks," McLeay et al., *supra*, at 15, and which is "the ultimate means of settlement for banks." *Id.* at 21. Central bank money, or the monetary base, "equals currency in circulation plus reserve balances." H.6 Statistical Release, *supra*, tbl. 1 n.5; *see* McLeay et al., *supra*, at 16 ("central bank money or 'base money'"). Currency is "mostly IOUs from the central bank," McLeay et al., *supra*, at 15, and reserves are "an IOU from the central bank to commercial banks." *Id.* at 25. Reserve balances are "balances held by depository institutions in master accounts and excess balance accounts at Federal Reserve Banks," and for September 2026 the Board of Governors reported reserve balances of $2,966.8 billion. H.6 Statistical Release, *supra*, tbl. 1 & n.4. An individual cannot hold a reserve balance, because "[t]he Reserve Banks do not hold accounts for individuals." Fed. Reserve Banks, Operating Circular No. 1, *Account Relationships* § 6.1 (eff. Sept. 1, 2023), https://www.frbservices.org/wp-content/uploads/090123-operating-circular-1.pdf. A depositor holds a claim against a depository institution, and the depository institution holds a claim against a Federal Reserve Bank.

When a depositor directs payment to a payee whose account is at another bank, the depositor's bank "settles with the [payee's] bank by transferring reserves." McLeay et al., *supra*, at 18. The transfer is made by book entry: a Reserve Bank debits the master account of the paying bank, and a Reserve Bank credits the master account of the receiving bank. The payment instruction may reach the Reserve Banks through any

---

19, 72 Stat. 339, 350 (1958) (codified as amended at 12 U.S.C. § 222), in "a sum equal to six per centum of the paid-up capital stock and surplus of such bank," payable "in gold or gold certificates." *Id.* § 2, 38 Stat. at 252 (codified as amended at 12 U.S.C. § 282). A Federal Reserve Bank "may receive from any of its member banks . . . deposits," *id.* § 13, 38 Stat. at 263 (codified as amended at 12 U.S.C. § 342), and the services of a Federal Reserve Bank to depository institutions, among them "wire transfer services," "automated clearinghouse services" and "settlement services," "shall be priced explicitly." *Id.* § 11A(b), (c)(1), as added by Pub. L. No. 96–221, § 107, 94 Stat. 132, 140–41 (1980) (codified as amended at 12 U.S.C. § 248a(b), (c)(1)). The supervisor of a national bank is the Comptroller of the Currency. Rev. Stat. § 324, as amended by Pub. L. No. 111–203, § 314(a), 124 Stat. 1376, 1523 (2010) (codified at 12 U.S.C. § 1(a)); *see Wachovia*, 546 U.S. at 306 (national banks are "chartered not by any State, but by the Comptroller of the Currency"); Bankr. Dkt. 28, at 6. SoFi's annual report describes "regulation, supervision and examination by the Federal Reserve" as a consequence of the parent's status as "a bank holding company." Opening Br. 18.

of several services, which differ in the timing of settlement and in whether settlement is gross or multilateral. The Fedwire Funds Service is "a real-time gross settlement system" whose transfers are "immediate, final, and irrevocable once processed."[6] Automated clearinghouse payments are sent in "batches," and the Reserve Banks "settle the payments by crediting and debiting the depository financial institutions' settlement accounts."[7] The FedNow Service transfers funds "in near real-time and at any time, any day of the year."[8] Participants in "private-sector clearing arrangements" use the National Settlement Service to "settle transactions on a multilateral basis through designated master accounts held at the Federal Reserve Banks."[9] Section 2.3 of the Operating Circular states the general rule: "Debit and Credit Transaction Activity of the Financial Institution . . . with or through any Reserve Bank, regardless of location, is settled in the Financial Institution's Master Account."[10] The Reserve Banks "generally maintain no more than one debtor-creditor relationship with a Financial Institution." Operating Circular No. 1, *supra*, § 2.1.

SoFi Bank's master account is at the Federal Reserve Bank of San Francisco. A financial institution maintains a master account with "the Reserve Bank in the Federal Reserve District in which the Financial Institution is located," Operating Circular No. 1, *supra*, § 2.2(b), and under Regulation D a financial institution is located in

[6] Bd. of Governors of the Fed. Reserve Sys., *Fedwire Funds Services* (last updated June 25, 2024), https://www.federalreserve.gov/paymentsystems/fedfunds_about.htm (a participant originates a transfer "by instructing a Federal Reserve Bank to debit funds from its own account and credit funds to the account of another participant").

[7] Bd. of Governors of the Fed. Reserve Sys., *Automated Clearinghouse Services* (last updated Dec. 13, 2024), https://www.federalreserve.gov/paymentsystems/fedach_about.htm (the Reserve Banks and the Electronic Payments Network "are the two national ACH operators," and "interoperator payments are settled by the Reserve Banks").

[8] Bd. of Governors of the Fed. Reserve Sys., *FedNow Service* (last updated July 20, 2023), https://www.federalreserve.gov/paymentsystems/fednow_about.htm (a liquidity management transfer "supports participants in a private-sector instant payment service backed by a joint account at a Reserve Bank by enabling transfers between the master accounts of participants and a joint account").

[9] Bd. of Governors of the Fed. Reserve Sys., *National Settlement Service* (last updated July 21, 2023), https://www.federalreserve.gov/paymentsystems/natl_about.htm.

[10] The Regents of the University of Michigan look to "where the funds are subject to withdrawal and control." Regents' Br. 8. A withdrawal that passes "with or through any Reserve Bank" is "settled in" the master account. Operating Circular No. 1, *supra*, § 2.3.

the District "specified in its charter or organizing certificate." *Id.* § 2.5. The Board of Governors' database of institutions with access to Reserve Bank accounts lists "SOFI BANK, NATIONAL ASSOCIATION," Cottonwood Heights, Utah, Reserve Bank District "San Francisco," access effective November 16, 2021. Bd. of Governors of the Fed. Reserve Sys., *Master Account and Services Database: Existing Access* (updated Sept. 18, 2026), https://www.federalreserve.gov/paymentsystems/account-and-access-disclosure/holder-data.csv; *see* https://www.federalreserve.gov/paymentsystems/master-accounts-data-definitions.htm (the field "shows the Federal Reserve District from which the institution accesses a Reserve Bank master account and financial services"). SoFi's annual report defines "FRB" as "Federal Reserve Bank of San Francisco." Opening Br. 18. Utah is in the Twelfth District, which the Federal Reserve Bank of San Francisco serves. Fed. Reserve Bank of S.F., *Our District*, https://www.frbsf.org/about-us/our-district/. A master account is "the record of financial rights and obligations of an Account Holder and the ARB [Administrative Reserve Bank] . . . with respect to each other." Operating Circular No. 1, *supra*, § 2.2(l). The Circular attaches to a master account the ordinary incidents of a deposit account: a daily statement of account, *id.* § 4.1; checks drawn against the account, *id.* § 2.9; overdrafts and the collection of overdrafts, *id.* §§ 5.1–5.2; a security interest securing overdrafts, *id.* § 5.3; and monthly service charges. *Id.* § 4.2. The Circular is governed "by Federal law, and, to the extent not inconsistent with Federal law, by the laws of the State of the head office of the applicable Reserve Bank," and "[a]ny action against a Reserve Bank for any act or omission relating to an account relationship or transaction contemplated by this Circular must be brought . . . in the United States District Court where the head office of the applicable Reserve Bank is located." *Id.* § 7.5.

The Debtor's claim is against SoFi Bank, and SoFi Bank's claim is against the Federal Reserve Bank of San Francisco. A reserve balance is a debt owed by a Federal Reserve Bank, and a debt is located where the obligor is found. The series of claims accordingly ends in San Francisco, in a balance on the books of the Federal Reserve

Bank of San Francisco, and an action against the Reserve Bank relating to the account must be brought in the district of the Reserve Bank's head office. Operating Circular No. 1, *supra*, § 7.5. Judge Lafferty placed SoFi Bank "in Utah" by the address of the bank's "corporate headquarters," in Cottonwood Heights. Bankr. Dkt. 24, at 2 & n.1. The Board of Governors' record of SoFi Bank's access to a master account gives the same city, Cottonwood Heights, Utah, and the Reserve Bank District "San Francisco." The address of a bank's main office does not locate the bank's reserve balance.

SoFi Bank can also be sued in San Francisco under the terms of use. The terms of use, which the Regents of the University of Michigan accept "cover[] SoFi Bank," select "the state and federal courts located within San Francisco County" for disputes under the terms, Opening Br. 19–20; Bankr. Dkt. 28, at 5; Regents' Br. 9–10, and under *Harris* a debt is reachable wherever the obligor "could himself be sued." 198 U.S. at 222.[11]

### 1.4 The Breadth of the Rule Is the Breadth of the Statute

The Regents of the University of Michigan object that section 1408 "should not locate every customer's deposit at the parent's headquarters merely because banking operations are directed there." Regents' Br. 9. The opening brief anticipated the objection: "The breadth is Congress's," Opening Br. 20, and "[i]nconvenience is a ground for transfer after a hearing" under 28 U.S.C. § 1412. Opening Br. 29. The same objection was made in the Ninth Circuit about domain names. "A single piece of intangible property may be located in multiple places for some purposes," *Office Depot*, 596 F.3d at 702, and the judgment debtor in *Office Depot* argued "that if the domain names under VeriSign's control are located in the district where VeriSign has its headquarters, every '.net' and '.com' domain name is located in that district." *Id.* at 703. The court held that "domain names are located where the registry is located," added that it saw "no reason

[11]The Regents of the University of Michigan reply that a forum for disputes "is not itself a designated place where the bank holds or repays the account balance." Regents' Br. 10. *Harris* does not ask where the balance is repaid. The Regents of the University of Michigan describe *Blixseth* as having "located interests in Nevada entities in Nevada because Nevada law governed those interests and proceedings there were necessary to reach them," *id.* at 8, and the terms that the Regents of the University of Michigan accept "select California law, and provide for disputes in San Francisco County." *Id.* at 9–10.

why for that purpose domain names are not also located where the relevant registrar is located," and affirmed. *Id.* On the statute as written, "a debtor whose deposits are held by a bank found in this district may commence a case here, whatever the balance and whatever else the debtor owns." Opening Br. 27. "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. "[I]f the Constitution grants a legislative power, the body in which that power is vested is Congress. Not the President, not the courts, not the states, not the people directly. Just Congress." Richard Primus, *Herein of "Herein Granted": Why Article I's Vesting Clause Does Not Support the Doctrine of Enumerated Powers*, 35 Const. Comment. 301, 331 (2020), https://conservancy.umn.edu/items/95d085f7-cf8d-4d4d-8344-c06766f7c30e (stating the "plain-meaning reading") (footnotes omitted). "There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted." *Lamie*, 540 U.S. at 538 (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)).

The Regents of the University of Michigan name no district in which the deposits were located. They disclaim "a categorical rule that a national bank's charter address determines every deposit's situs," Regents' Br. 10; they do "not rely on Michigan residence to foreclose the principal-assets ground," *id.* at 7–8, although they later "rel[y] on the Debtor's Michigan residence," *id.* at 14; and *Blixseth*, which they cite, rejected "bright-line" rules that intangible assets "are always located at the debtor's residence." *Montana v. Blixseth (In re Blixseth)*, 484 B.R. 360, 367 (B.A.P. 9th Cir. 2012). They acknowledge that the "burden of proving improper venue" is "on the venue challenger." Regents' Br. 14.

### 2 The Error Was Not Harmless

"Assuming that the procedure employed was erroneous," the Regents of the University of Michigan write, "the consequence remains subject to harmless-error review." Regents' Br. 11. They submit that "[a]ny procedural error should be treated as harmless on the Debtor's stated proffer," and that "the asserted connections are legally

insufficient to establish venue in this district." *Id.*[12] "The question," in their words, "is their legal significance under section 1408." *Id.* at 12. The Debtor accepts the question as stated, and Part 1 gives the answer: the accepted facts establish venue. Judge Lafferty therefore dismissed the case from a district in which Congress provided that the case "may be commenced," 28 U.S.C. § 1408, and an appellate court disregards only "errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111; *see* Fed. R. Bankr. P. 9005; Fed. R. Civ. P. 61.[13]

For that matter, Rule 1014(a) permits a court to dismiss a case for improper venue "only after a hearing on notice to the petitioner," Fed. R. Bankr. P. 1014(a)(1)(B), (a)(2),[14] "[t]he Fifth Amendment requires no less," Opening Br. 7, and "properly understood, § 2111 serves as a command to courts against overenforcing rights." Daniel Epps, *Harmless Errors and Substantial Rights*, 131 Harv. L. Rev. 2117, 2124 (2018), https://harvardlawreview.org/wp-content/uploads/2018/06/2117-2186_Online.pdf. Where "the constitutional provision guarantees a particular form of process, full stop," "a deprivation of that guarantee by definition affects substantial rights without requiring

[12] The authority on which the Regents of the University of Michigan rely, Regents' Br. 11–13, held a debtor unprejudiced by the want of a hearing because, offering no facts, he "rested on the (now) manifestly inadequate legal claim that he had an 'absolute' right to voluntarily dismiss his case." *Rosson v. Fitzgerald (In re Rosson)*, 545 F.3d 764, 776 (9th Cir. 2008). The Ninth Circuit has since held that the claim was correct, that section 1307(b) "confers upon the debtor an absolute right to dismiss a Chapter 13 bankruptcy case," and that *Rosson* "has been effectively overruled by *Law* [*v. Siegel*, 571 U.S. 415 (2014),] and is no longer binding precedent in this Circuit." *Nichols v. Marana Stockyard & Livestock Mkt., Inc. (In re Nichols)*, No. 20-60043, slip op. at 12, 16 (9th Cir. Sept. 1, 2021), https://cdn.ca9.uscourts.gov/datastore/opinions/2021/09/01/20-60043.pdf. Judge Lafferty sat on the Bankruptcy Appellate Panel that had affirmed the order the Ninth Circuit reversed. *Id.* at 1, 6, 16–17.

[13] Rule 9005 provides that "Fed. R. Civ. P. 61 applies in a bankruptcy case." Rule 61 provides that "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for . . . vacating, modifying, or otherwise disturbing a judgment or order," and that "[a]t every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." The Regents of the University of Michigan write that Rule 61 "directs courts to disregard errors that do not affect substantial rights," Regents' Br. 11, and omit "[u]nless justice requires otherwise."

[14] Rule 1014(a)(2) creates no procedure of its own: a case filed in an improper district may be dismissed or transferred "on the same grounds and under the same procedures as stated in (1)," and under Rule 1014(a)(1) the court may act "on its own or on a party in interest's timely motion," but "only after a hearing on notice to the petitioner, United States trustee, and other entities as the court orders." Fed. R. Bankr. P. 1014(a)(1)(A)–(B), (a)(2). "Only after" states a condition precedent.

any further harmlessness inquiry." *Id.*[15] The dismissal of this case without the hearing was such a deprivation. "If there is no way to describe the right that makes sense while still showing why harmless error analysis is appropriate, that is a strong clue that the error is one that should require automatic reversal." *Id.* at 2167. A right to trial by jury subject to that analysis would be "[t]he right to have a jury, and not a judge, determine whether you are guilty, unless a judge determines you are, in fact, guilty." *Id.* The right that the Regents of the University of Michigan describe[16] is the right to a hearing before the case is dismissed, unless a judge later determines, on the petitioner's own account of what she would have said, that she would have lost. Judge Lafferty, who dismissed the case without the hearing,[17] has since written that "[t]his Court is not persuaded that it would grant the Motion if there were to be a remand for that purpose," Bankr. Dkt. 42, at 2, and the Regents of the University of Michigan submit to this Court that the Debtor "has not shown how the omitted hearing would have produced a different

[15] "The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). The error in *Sullivan*, a constitutionally deficient reasonable-doubt instruction, "vitiates all the jury's findings," so that "[a] reviewing court can only engage in pure speculation—its view of what a reasonable jury would have done. And when it does that, 'the wrong entity judge[s] the defendant guilty.'" *Id.* at 281 (quoting *Rose v. Clark*, 478 U.S. 570, 578 (1986)). The order that Judge Lafferty actually rendered states that "[w]ithout the required schedules and documents, the Court cannot determine where Debtor's assets are located." Bankr. Dkt. 24, at 2.

[16] The Regents of the University of Michigan say they do not "ask the Court to disregard the hearing requirement." Regents' Br. 11. They ask the Court "to apply *Rosson*'s separate prejudice inquiry to the facts the Debtor says she would have presented." *Id.* at 13. Justice Alito argued in dissent in *Gonzalez-Lopez* that, "even if the majority were right about the scope of the Sixth Amendment right, the Court should nonetheless subject violations of the right to counsel of choice to harmless error review, reversing only if the violation harmed the quality of representation that the defendant received." Epps, *supra*, at 2161. That alternative "was functionally indistinguishable from his primary rationale (defining the Sixth Amendment right more narrowly)," and "the practical difference between Justice Alito's two alternative rationales is essentially zero." *Id.* at 2161–62.

[17] The Bankruptcy Appellate Panel has vacated a dismissal ordered without notice while "express[ing] no opinion as to the merits of dismissal." *Benzeen Inc. v. U.S. Tr. (In re Benzeen Inc.)*, No. CC-18-1185-FLS, slip op. at 13 (B.A.P. 9th Cir. Mar. 6, 2019), https://cdn.ca9.uscourts.gov/datastore/bap/2019/03/07/Benzeen%20Memorandum%2018-1185.pdf. "We acknowledge that the dismissal . . . may have been inevitable. . . . Nevertheless, a court may not 'cut to the chase' in a manner that deprives a party of due process." *Id.* at 12 (quoting *Sanders v. U.S. Tr. (In re Sanders)*, No. CC-15-1344-FKiKu, 2016 WL 3971324, at *3 (B.A.P. 9th Cir. July 15, 2016)). The Regents of the University of Michigan describe *Benzeen* as having "vacated a dismissal entered without adequate notice and without considering the estate's and creditors' interests, even though dismissal might ultimately be inevitable." Regents' Br. 12–13. Judge Lafferty sat on the Panel. *Benzeen*, slip op. at 2; *see* Opening Br. 10 n.1.

disposition." Regents' Br. 6. "[J]udicial predictions about the outcome of hypothesized litigation cannot substitute for the actual opportunity to defend that due process affords every party against whom a claim is stated." *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 471 (2000); *see* Opening Br. 10.[18] "Procedure of this style has been questioned even in systems, real and imaginary, less concerned than ours with the right to due process." *Nelson*, 529 U.S. at 468. "A well-known work offers this example": "'Consider your verdict,' the King said to the jury. 'Not yet, not yet!' the Rabbit interrupted. 'There's a great deal to come before that!'" *Id.* at 468 n.2 (quoting L. Carroll, *Alice in Wonderland and Through the Looking Glass* 108 (Messner 1982)). Judge Lafferty signed the Order Dismissing Case for Improper Venue on June 23, 2026, and the clerk entered the order on June 24, 2026. Bankr. Dkt. 24, at 1. The Bankruptcy Noticing Center sent the order to the Debtor by e-mail on June 25, 2026, at 12:57 a.m. Bankr. Dkt. 27, at 1. The Debtor's proffer on venue is dated June 25, 2026, and was filed on June 29, 2026. Bankr. Dkt. 28, at 4–6, 9.[19]

---

[18]The Regents of the University of Michigan "recognize[] the limit illustrated by" *Nelson* and distinguish it as a case about "a prediction about evidence the Debtor might offer." Regents' Br. 12. *Nelson* did not turn on the quality of the prediction. The Federal Circuit had concluded that the party "had not been prejudiced," on his "failure to show that 'anything different or additional would have been done' to stave off the judgment." 529 U.S. at 464–65. A unanimous Supreme Court reversed: "We neither dispute nor endorse the substance of this speculation." *Id.* at 471. "The law, at its most fundamental, does not render judgment simply because a person might have been found liable had he been charged." *Id.* (quoting *Ohio Cellular Prods. Corp. v. Adams USA, Inc.*, 175 F.3d 1343, 1354 (Fed. Cir. 1999) (Newman, J., dissenting)).

[19]The certificate of notice gives the time of the electronic transmission as "Jun 25 2026 00:57:00" and states that "[e]lectronic transmission is in Eastern Standard Time." Bankr. Dkt. 27, at 1. The header section of the message by which the order was sent includes the following six fields, in this order and with their folding white space normalized:

```
Received: by 2002:a05:6918:d3f2:b0:47c:8682:7c91 with SMTP id o18csp1066475ysw;
    Wed, 24 Jun 2026 21:57:12 -0700 (PDT)
Received: from mail-h.noticingcenter.com (mail-h.noticingcenter.com. [207.243.117.43])
    by mx.google.com with ESMTPS id 6a1803df08f44-8df82f4758asi201281276d6.334.2026.06.24.21.57.11
    for <nadja@njy.dev>
    (version=TLS1_2 cipher=ECDHE-ECDSA-AES128-GCM-SHA256 bits=128/128);
    Wed, 24 Jun 2026 21:57:11 -0700 (PDT)
Received: from prod-bnc4-pri.bsg.na.baesystems.com ([172.17.70.200])
    by mail-h.noticingcenter.com (8.14.7/8.14.7) with ESMTP id 65P4vBU7033001
    for <nadja@njy.dev>; Thu, 25 Jun 2026 00:57:11 -0400
Message-Id: <202606250457.65P4vBU7033001@mail-h.noticingcenter.com>
Date: Thu, 25 Jun 2026 04:57:11 +0000
X-Mailer: Tcl ezsmtp Mailer Package (build 2009/04/14)
```

A `Received:` field is the trace record that an SMTP server inserts when the server accepts a message, and the record "indicates the identity of the host that sent the message, the identity of the host that received the message (and is inserting this time stamp), and the date and time the message was received." J. Klensin, *Simple Mail Transfer Protocol*, RFC 5321, § 4.1.1.4 (Oct. 2008), https://www.rfc-editor.org/rfc/rfc5321.txt. Because SMTP servers "MUST prepend Received lines to messages" and "MUST NOT change the order of existing lines," *id.* § 4.4, the third `Received:` field records the earliest receipt and the first `Received:` field records the latest. The `Message-Id:` field contains the message identifier; the `Date:` field contains the origination date, which "specifies the date and time at which the creator of the message indicated that the message was complete and ready to enter the mail delivery system"; and the `X-Mailer:` field is an optional field, which the specification of the message format leaves "uninterpreted." P. Resnick, ed., *Internet Message Format*, RFC 5322, §§ 3.6.1, 3.6.4, 3.6.8 (Oct. 2008), https://www.rfc-editor.org/rfc/rfc5322.txt. The zone in each date-time "specifies the offset from Coordinated Universal Time (UTC, formerly referred to as 'Greenwich Mean Time') that the date and time-of-day represent." *Id.* § 3.3. SMTP servers that create `Received:` fields "SHOULD use explicit offsets in the dates (e.g., -0800), rather than time zone names of any type"; "[i]f it is desired to supply a time zone name, it SHOULD be included in a comment," which is the form of the `(PDT)` that follows the zone in the first two `Received:` fields; and "[i]f UT is needed, the receiver need merely do some simple arithmetic to convert the values." RFC 5321 § 4.4. The arithmetic gives 04:57:11 UTC on June 25, 2026, for the origination date (04:57:11 at `+0000`), for the receipt by `mail-h.noticingcenter.com` (00:57:11 at `-0400`), and for the receipt by `mx.google.com` (21:57:11 on June 24 at `-0700`), and gives 04:57:12 UTC for the receipt that the first `Received:` field records (21:57:12 on June 24 at `-0700`).

The header section also includes the three fields that compose an "ARC Set," among them an `ARC-Seal:` field and an `ARC-Message-Signature:` field, under the Authenticated Received Chain protocol, which is "loosely based on concepts from evidence collection" and "provides an authenticated 'chain of custody' for a message." K. Andersen et al., *The Authenticated Received Chain (ARC) Protocol*, RFC 8617, at 1, §§ 2, 3.1 (July 2019), https://www.rfc-editor.org/rfc/rfc8617.txt. Each of the two fields contains an RSA signature over a SHA-256 hash (`a=rsa-sha256`) and names `google.com` as the signing domain (`d=google.com`) and `arc-20260327` as the selector (`s=arc-20260327`), so that the public key for both signatures is the key published in the DNS at `arc-20260327._domainkey.google.com`. D. Crocker et al., eds., *DomainKeys Identified Mail (DKIM) Signatures*, RFC 6376, §§ 3.3.2, 3.5, 3.6.2.1 (Sept. 2011), https://www.rfc-editor.org/rfc/rfc6376.txt. The signature in the `ARC-Message-Signature:` field covers the header fields named in the `h=` tag of the field, which reads `h=mime-version:to:subject:from:date:message-id`, and covers the hash of the message body in the `bh=` tag of the field; the signature in the `ARC-Seal:` field covers the three fields of the set, including the tag `t=1782363431` of the `ARC-Seal:` field. *Id.* §§ 3.5, 3.7; RFC 8617 § 5.1.1. Both signatures verify against the 2,048-bit RSA public key in the TXT record that the DNS returned for `arc-20260327._domainkey.google.com` at 06:16 UTC on November 16, 2026 (10:16 p.m. on November 15, Pacific standard time), and the Chain Validation Status of the message is therefore "pass." RFC 8617 § 5.2; RFC 6376 § 6.1.3. The TXT record read as follows, with its strings concatenated and with the base64 text of the key folded onto five lines:


```
k=rsa; p=MIIBIjANBgkqhkiG9w0BAQEFAAOCAQ8AMIIBCgKCAQEAtD6095JmnsBDjXMbLTrQL3SGndVv2ObcB8T+ChcaBBK
    fqXgTlOhy3D/yetii3MDpNOiVHvTstjehrqtduSeApKlAtbdMZostjpfuVf/LbRmm2lff9dpfXgOzXFHTz0Z2ifmnz3k
    tdgYvTW5ENryGlcreZlbYie0pgqK5BSXNQ6EWechsUJxmRoqDxhb8WVQeyPJ334Yq8hHxvZyTCTY/k8waZHCL4Q7EprV
    Mn9lEFxsMBBKgJ+FbzTxlQmRVJ7IzzfAtxhZVJEnpKEUDWmgXtxwR4bemvsm6XYaeCwR9gj8RpACyny2vPRVHhFAwegc
    qW6g0JdPWvDGWY53WymR5CQIDAQAB
```


RFC 6376 §§ 3.6.1, 3.6.2.2. The tag `t=1782363431` records "[t]he time that this signature was created" as "the number of seconds since 00:00:00 on January 1, 1970 in the UTC time zone," and in that number "[l]eap seconds are not counted." *Id.* § 3.5; *see* RFC 8617 § 4.1.3. Because 1,782,363,431 seconds are 20,629 days of 86,400 seconds and 17,831 seconds, because the 20,629th day after January 1, 1970, is June 25, 2026, and because 17,831 seconds are 4 hours, 57 minutes, and 11 seconds, the time that the tag records is 04:57:11 UTC on June 25, 2026.

A zone written as a name belongs to the obsolete syntax of the message format, and "since items in this syntax have been determined to be non-interoperable or to cause significant problems for recipients of messages, they MUST NOT be generated by creators of conformant messages." RFC 5322 §§ 1.2.3, 4.3. A conformant receiver must nevertheless accept the obsolete zone names and must interpret the names as section 4.3 provides: "EDT is semantically equivalent to -0400" and "EST is semantically equivalent to -0500." *Id.* §§ 4, 4.3. If the "Eastern Standard Time" of the certificate were the zone that section 4.3 calls

# 3 The Remedy Is Reversal with Directions

## 3.1 This Court Should Decide the Question of Venue

Under the principle of party presentation, courts "rely on the parties to frame the issues for decision" and "normally decide only questions presented by the parties." *United States v. Sineneng-Smith*, 590 U.S. 371 (2020) (slip op. at 3–4) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008), and *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in denial of rehearing en banc)), https://www.supremecourt.gov/opinions/19pdf/19-67_n6io.pdf. The Regents of the University of Michigan ask that the question of venue be determined in this Court only if the question is determined in their favor. They describe their request as one to resolve "a purely legal issue fully supported by the record," Regents' Br. 13; they add that "[i]f the Court instead concludes that the alleged operational control or account terms raise a material situs question, *Hall* requires that question to be decided on remand," *id.* at 14; and they ask that any remand be "for a hearing on notice under Rule 1014(a), leaving the bankruptcy court to decide venue," and that this Court "not declare venue proper on this record." *Id.* at 16–17. Whether a question is one of law does not depend on the answer. "Unless there are pertinent factual disputes, a bankruptcy court's interpretation of the venue statutes and its determination of whether a case is filed in an improper venue are reviewed de novo." *Blixseth*, 484 B.R. at 365 (cited at Regents' Br. 7). No factual dispute is presented on this appeal: the Regents of the University of Michigan "accept[] the Debtor's factual

---

EST, the time that the certificate gives would be 05:57:00 UTC, which is 59 minutes and 48 seconds after the latest of the three receipts. Under the Act of March 19, 1918, as amended, however, the standard time of the second zone "shall be known and designated as eastern standard time"; the standard time of the second zone is Coordinated Universal Time "retarded by 5 hours," "[e]xcept as provided in section 3(a) of the Uniform Time Act of 1966"; and section 3(a) provides that, from the "second Sunday of March" to the "first Sunday of November," the standard time of each zone "shall be advanced one hour and such time as so advanced shall for the purposes of such Act of March 19, 1918, as so modified, be the standard time of such zone during such period." Act of Mar. 19, 1918, ch. 24, §§ 1, 4, 40 Stat. 450, 450–51, as amended by Uniform Time Act of 1966, Pub. L. No. 89–387, § 4, 80 Stat. 107, 108, and America COMPETES Act, Pub. L. No. 110–69, § 3013(c)(3), 121 Stat. 572, 598–99 (2007) (codified as amended at 15 U.S.C. §§ 261(a), 263); Uniform Time Act of 1966 § 3(a), 80 Stat. at 107, as amended by Energy Policy Act of 2005, Pub. L. No. 109–58, § 110(a), 119 Stat. 594, 615 (codified as amended at 15 U.S.C. § 260a(a)). On June 25, 2026, eastern standard time was accordingly four hours behind Coordinated Universal Time, and the time that the certificate gives is 04:57:00 UTC, which is eleven seconds before the origination date of the message.

proffer for purposes of this argument." Regents' Br. 9. The Bankruptcy Appellate Panel in *Blixseth*, on a record in which the bankruptcy court "decided no questions of fact," decided the location of the debtor's principal assets itself and reversed the dismissal. 484 B.R. at 366, 371. *Hall*, which the Regents of the University of Michigan cite for the proposition that "[a]n appellate court cannot supply missing findings on a material factual question," Regents' Br. 13, states the rule that governs here: "A district court, reviewing a bankruptcy appeal, can decide an issue that is not raised on appeal, if that issue is purely legal and is fully supported by the record." *Oaks of Woodlake Phase III, Ltd. v. Hall, Bayoutree Assocs., Ltd. (In re Hall, Bayoutree Assocs., Ltd.)*, 939 F.2d 802, 804 (9th Cir. 1991). The question of venue was raised on this appeal.

An affirmance on the ground of harmless error requires a holding that venue was improper (Part 2). After a reversal, the answer to the question of venue determines what the bankruptcy court may do, because Rule 1014(a) gives a bankruptcy court one power over a petition filed in the proper district and another over a petition filed in an improper district: "[i]f a petition is filed in the proper district, the court may transfer the case to another district in the interest of justice or for the convenience of the parties," and only "[i]f a petition is filed in an improper district" may the court "dismiss the case." Fed. R. Bankr. P. 1014(a)(1)–(2). A mandate silent on the question of venue would return the question to Judge Lafferty, who has answered the question twice: in the order under review, Bankr. Dkt. 24, at 2 & n.1, and on July 13, 2026, with the Debtor's proffer before him, when he wrote that "[t]his Court is not persuaded that it would grant the Motion if there were to be a remand for that purpose" and "is not persuaded the Motion raises a substantial issue." Bankr. Dkt. 42, at 2.

If the deposits were located in this district, the petition was filed in the proper district, and the case proceeds. If the deposits were not located in this district, the Regents of the University of Michigan observe that "Rule 1014(a)(2) permits either dismissal or transfer when venue is improper," so that "[i]mproper venue alone does not make dismissal inevitable." Regents' Br. 15. The Debtor does not ask for a transfer.

She told the bankruptcy court that "the Debtor does not consent to transfer while [the question of venue] remains under review or subject to it," Bankr. Dkt. 35, at 5, and she now waives a transfer under Rule 1014(a)(2) altogether. A transfer in place of a dismissal protects the party who chose the forum: a dismissal "makes it possible for [the plaintiff] to lose out completely, through the running of the statute of limitations in the forum finally deemed appropriate," and the provision for transfer "avoids this latter danger." *Cf. Norwood v. Kirkpatrick*, 349 U.S. 29, 31 (1955) (quoting *All States Freight, Inc. v. Modarelli*, 196 F.2d 1010, 1011 (3d Cir. 1952)). An order of transfer "does not end but preserves" an action "as against the running of the statute of limitations and for all other purposes," whereas a dismissal "puts an end to the action and hence is final and appealable." *Cf. id.* (quoting *Jiffy Lubricator Co. v. Stewart-Warner Corp.*, 177 F.2d 360, 362 (4th Cir. 1949)). The Debtor chose this district, Bankr. Dkt. 1, at 2, and does not ask that the case be preserved for another district. *Cf.* Pl.'s Resp. to Order to Show Cause at 25, *Chi v. Regents of the University of Michigan*, No. 3:26-cv-11021-EMC (N.D. Cal. Nov. 3, 2026), ECF No. 15 (the Debtor, as plaintiff: "[T]he transfer that § 1406(a) permits in place of dismissal . . . exists for the plaintiff's protection . . . . The Plaintiff does not ask for that 'protection.'" (citations omitted)).

Section 2106 authorizes this Court to "direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106. Any further proceeding on venue that the Court may require can be held in this Court. The statute that created the reference provides: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d); *see Hall*, 939 F.2d at 805 ("If the district court had withdrawn the reference before making its bad-faith finding, it would have been free to hold a hearing and make its own factual findings."). Judge Lafferty's written statement that "[t]his Court is not persuaded that it would grant the Motion if there were to be a remand for that purpose," Bankr. Dkt. 42, at 2, is cause to withdraw the reference.

### 3.2 The Order of July 13, 2026, Should Be Reversed

The Order Denying Motion to Alter or Amend rests on the proposition that "a trial court lacks authority to alter the status quo established by an order that is the subject of a pending appeal," and denies the motion "for lack of jurisdiction." Bankr. Dkt. 42, at 1–2. The Regents of the University of Michigan "do[] not defend the July 13 order's premise that the pending appeal deprived the bankruptcy court of authority to decide the motion," and they agree that under Rule 8002(b)(2) the notice of appeal "did not become effective until the court entered the order disposing of that timely motion." Regents' Br. 14–15. The opening brief said the same: "On July 13, 2026, the notice of appeal was not effective; it became effective upon the entry of the order under review," and "[t]he bankruptcy court had jurisdiction to decide the motion." Opening Br. 12. The Order Denying Motion to Alter or Amend should be reversed with the Order Dismissing Case for Improper Venue.

### 3.3 The Authority to Raise Venue Without a Motion Is Conditioned on a Hearing

The Regents of the University of Michigan assert that the bankruptcy court has "express authority to raise venue on its own." Regents' Br. 11. Rule 1014(a) has expressed that authority since 2007, in the sentence that requires the hearing. Before 2007 the Rule required a motion, and since 1978 the statutes have treated improper venue as an objection for a party to raise or waive.

In 1978, Congress provided that a bankruptcy court in which a case was filed "laying venue in the wrong division or district may, in the interest of justice and for the convenience of the parties, retain such case or proceeding, or may transfer" it, and that "[n]othing in this chapter shall impair the jurisdiction of a bankruptcy court of any matter involving a party who does not interpose timely and sufficient objection to the venue." Pub. L. No. 95–598, § 241(a), 92 Stat. at 2670 (former 28 U.S.C. § 1477). The statute provided for retention or transfer, and not for dismissal. The 1983 rule implemented the 1978 statute, and the advisory committee wrote: "Under this rule, a

motion by a party in interest is necessary. There is no provision for the court to act on its own initiative." Fed. R. Bankr. P. 1014 advisory committee's note to 1983 adoption. In 1984, Congress replaced section 1477 with section 1412, which "authorizes only the transfer of a case," and the rule was "amended to delete the reference to retention of a case commenced in the improper district"; dismissal, "as authorized by 28 U.S.C. § 1406," was "added to the rule," and the note continues: "If a timely motion to dismiss for improper venue is not filed, the right to object to venue is waived." *Id.*, advisory committee's note to 1987 amendment. For every district court, section 1406(b) provides: "Nothing in this chapter shall impair the jurisdiction of a district court of any matter involving a party who does not interpose timely and sufficient objection to the venue." The revisers' note records that the subsection "makes clear the intent of Congress that venue provisions are not jurisdictional but may be waived." 28 U.S.C. § 1406 historical and revision notes (1948 Act). The Supreme Court states the distinction in *Wachovia*: "Venue is largely a matter of litigational convenience; accordingly, it is waived if not timely raised," whereas subject-matter jurisdiction "must be considered by the court on its own motion, even if no party raises an objection." 546 U.S. at 316. *Blixseth*, which the Regents of the University of Michigan cite, observes that "there is no bankruptcy-specific venue statute similar to 28 U.S.C. § 1406(a) requiring transfer or dismissal of a case if venue is improper." *Blixseth*, 484 B.R. at 365 n.5. The Rule first recognized action without a motion in 2007, and the committee note explains: "Courts have generally held that they have the authority to dismiss or transfer cases on their own motion. The amendment recognizes this authority and also provides that dismissal or transfer of the case may take place only after notice and a hearing." Fed. R. Bankr. P. 1014 advisory committee's note to 2007 amendment. No party objected to venue in this case. Opening Br. 26.

### 3.4 The Case Should Be Reassigned on Remand

A finding either that the original judge would have "substantial difficulty in putting out of his or her mind previously-expressed views" or that "reassignment is advisable to

preserve the appearance of justice" "is sufficient to support reassignment on remand." Opening Br. 15 (quoting *Krechman v. County of Riverside*, 723 F.3d 1104, 1111–12 (9th Cir. 2013)). The Regents of the University of Michigan write that the July 13 order's statement that the court "declines to entertain any further requests for relief" "followed its statement that it lacked jurisdiction over motions filed after dismissal" and, "[r]ead in context," "does not show that the judge would refuse to apply corrected legal standards or conduct the hearing this Court directs." Regents' Br. 17–18. The context is the jurisdictional holding, which the Regents of the University of Michigan do not defend. *Id.* at 14–15. The Ninth Circuit declined to reassign in *Krechman* because it had "no reason to believe that Judge Wright would be unable fairly and correctly to apply the Rule 50(a) standard on remand." *Krechman*, 723 F.3d at 1112. Here Judge Lafferty has supplied a reason in writing: "This Court is not persuaded that it would grant the Motion if there were to be a remand for that purpose." Bankr. Dkt. 42, at 2.

The Regents of the University of Michigan compare *Cegavske*. Regents' Br. 17. There the Ninth Circuit reassigned where the judge, besides limiting the plaintiffs' choice of out-of-state counsel, "sua sponte and without notice dismissed Plaintiffs' case based on a motion the State had previously withdrawn," "misread the complaint," and "dismissed the complaint without leave to amend despite Plaintiffs' explicit request," and the Ninth Circuit did so "reluctantly," because the errors "may suggest to a reasonable outside observer that reassignment 'to maintain the appearance of justice' is necessary." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1046 (9th Cir. 2015), *overruled in part on other grounds by Ariz. All. for Retired Ams. v. Mayes*, No. 22-16490, slip op. at 18–19 (9th Cir. Aug. 7, 2026) (en banc), https://cdn.ca9.uscourts.gov/datastore/opinions/2026/08/07/22-16490.pdf. Here Judge Lafferty dismissed sua sponte and without notice on no motion at all; announced a rule of venue for "consumer bankruptcy" that the Regents of the University of Michigan will not defend; denied a timely motion for lack of jurisdiction on a ground the Regents of the University of Michigan do not defend; stated that the court was "not persuaded that it would grant the Motion if there were to be a remand for

that purpose," Bankr. Dkt. 42, at 2; and had sat on the panel that vacated a sua sponte dismissal for want of notice "even though dismissal might ultimately be inevitable." Regents' Br. 12–13; *Benzeen*, slip op. at 2, 12. That record would suggest to a reasonable outside observer that reassignment is necessary to maintain the appearance of justice.

### 3.5 The Case Should Not Be Transferred on the Bankruptcy Court's Own Motion

The Regents of the University of Michigan say the bankruptcy court should not be "barred from considering transfer sua sponte," because Rule 1014(a)(1)(A) permits a bankruptcy court to act "on its own." Regents' Br. 18. Rule 1014(a)(1)(A) states what a bankruptcy court may do of its own accord. Section 2106 states what a court of appellate jurisdiction may require of the court under review: "such further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106. The circumstances are that Judge Lafferty dismissed the case on his own motion, without the hearing that Rule 1014(a)(1)(B) requires, and then wrote that "the Court declines to entertain any further requests for relief in this matter." Bankr. Dkt. 24; Bankr. Dkt. 42, at 2. "The Debtor's convenience is the Debtor's to weigh," and "[w]hether the interest of justice or the convenience of some other party warrants a transfer is a 'fact-intensive' question . . . for a party in interest to raise and a hearing to decide." Opening Br. 31. The answer of the Regents of the University of Michigan is that the Debtor's arguments "address her preference to remain here." Regents' Br. 15. "The convenience of the parties," 28 U.S.C. § 1412, is the parties' convenience, and the Regents of the University of Michigan have asserted no inconvenience of their own. Under 28 U.S.C. § 1404(a), "the *convenience* of the plaintiff is not important to the balancing process," *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979), "for the logical reason that courts have no call to save a plaintiff from himself," *In re Ralston Purina Co.*, 726 F.2d 1002, 1005 n.5 (4th Cir. 1984), and the party who seeks a transfer has "the burden to justify by particular circumstances that the transferor forum was inappropriate." *Savage*, 611 F.2d at 279.

The direction should reach a transfer under Rule 1014(a)(1) and a transfer under Rule 1014(a)(2). A transfer under Rule 1014(a)(2) presupposes a determination that venue is improper, and a transfer ordered on the bankruptcy court's own motion would carry the case to another district on the strength of a determination that had not been reviewed. A dismissal "is final and appealable"; an order of transfer "does not end but preserves" the case. *Cf. Norwood*, 349 U.S. at 31 (quoting *Jiffy Lubricator*, 177 F.2d at 362). The Debtor has waived a transfer under Rule 1014(a)(2), and the Regents of the University of Michigan have not asked for a transfer.

## Conclusion

This Court should hold that venue of the case lies in this district under 28 U.S.C. § 1408(1); reverse the Order Dismissing Case for Improper Venue, Bankr. Dkt. 24, and the Order Denying Motion to Alter or Amend Order Dismissing Case, Bankr. Dkt. 42; remand with directions that the case proceed before a bankruptcy judge other than the Honorable William J. Lafferty III, and that the case not be transferred under Rule 1014(a)(1) or Rule 1014(a)(2) except on a party in interest's timely motion and after the hearing on notice that Rule 1014(a)(1)(B) requires; and direct that costs on appeal be taxed against the Regents of the University of Michigan. 28 U.S.C. § 2106; Fed. R. Bankr. P. 8021(a)(3). Should the Court hold that venue does not lie in this district, the Debtor waives a transfer under Rule 1014(a)(2). On any remand the Court should direct that the case not be transferred under Rule 1014(a)(1) or Rule 1014(a)(2) on the bankruptcy court's own motion.

Dated: November 15, 2026

Respectfully submitted,

/s/ Nadja Yang

Nadja Yang, Debtor and Appellant *pro se*

Assisted-by: Claude Fable 5.2 via Claude Code